Good morning, Your Honors. My name is John Grady. I represent the appellants, the Andersons, the Wheatleys, and the Wilkins. The gist of this case is that the plaintiffs have alleged that in the application process for three real estate mortgages, they were discriminated against. The properties that were in the all-white area, and they believe that the cumulative process that they experienced was discriminatory and also breached the contract. What did they have to show as part of the prima facie case? Well McDonald Douglas B. Green and some of the other cases suggest that there were certain formulas for a prima facie case. They also suggested that those formulas might not necessarily apply to every case. In this case, I think that they have a burden of showing that, number one, they could show that there were some statistical disparities in the application process. They, of course, were not permitted to show that. They had to show that. They didn't have to show it. I think that a prima facie case is like putting logs in a pile, and at some point in time, the court says, well, that seems to be enough. And I don't think there's any magic answer. This is not a case where you have to compare their treatment to some other people who might have applied for similar mortgages. That's why I asked you what did they have to show, because did they have to show that? Why not, as Judge Jordan says? And we have an opinion in Stewart v. Rector's University that says the McDonald Douglas framework applies in the context of 1981, not just in Title VII. Why wouldn't we apply it here in this 1981 case? Why shouldn't they have to bear some burden of showing that they were treated differently than people in a non-protected class? I think they do. I would agree they have to show it. In Stewart, for example, one of the significant reasons that the court ruled in as evidence of discrimination was the fact that the university did not comply with its own procedures. We've alleged in this case that Wachovia had certain procedures for applying for mortgages, and that those procedures were not complied with. We've alleged that this fellow Hoxton, who was the loan officer, he was only supposed to take the loan processing papers and send them on to the underwriter. The allegation is that he created criteria which were unnecessary, different, and much more difficult. But those criteria were set forth. I mean, I could see it if they weren't set forth in certain guidelines. But each of the criteria, there was a reason in terms of guidelines or regulations as to why those criteria were imposed. Was there not, for instance, the use of the credit card for the deposit, the 10% versus the 20%, the appraisal, the livability? Aren't all those conditions actually set forth in guidelines? So, they're not that unusual. Well, there isn't any condition that you have to have your property in a moving condition before... No, but livability is included in the regulations. No heat on the second floor? Isn't that the sort of thing? I mean, that's... Well, let me ask you this. It's not contested, is it, that in fact it lacked heat on the second floor and it, I'm talking about the one specific home, the Wheatley home, and that there was asbestos on the pipes in the basement and that these, those, as a factual matter, those things are real, right? Right. Okay. Well, if those things are real, doesn't a lack of heat in a significant portion of the home go to the livability of the residents and something that a rational loan officer would want addressed before laying out a couple hundred thousand dollars in loan money? Well, there was testimony in the record that this particular unit we're talking about was livable and someone had been renting it out and the second floor, as I understand, the proposal was simply to put in heating units for the second floor. The complaint really is that even if there were some criteria, Hoxton overdid all these criteria. He made this process far more expensive than it should have been. For example, there was problems in the Anderson property in the basement with water, and Hoxton said he wanted the whole basement redone. He wanted the whole place painted, and there was a problem with the initial appraisal, for example, in the Anderson, and, and, uh... In fact, the appraiser said, I can't appraise this house in its condition, right? The appraiser said that, and Anderson said, well, there's another appraiser who will appraise it, there are other comparables, and Hoxton said, I'm not going to let this go forward until it meets my standards. And the standards are not that the place has to be in perfect condition, and the, the, the gripe throughout is that Hoxton made things more difficult for, uh, these individuals. Do we know that that's just Hoxton's way of doing things, that he just goes by the book, or do we know, is there evidence that he made it more difficult than he made it for others? Do we have evidence of that latter fact? Well, my clients have testified that they've dealt with this bank on other, other transactions, and even with Hoxton, and they never had this kind of treatment. That, from their point of view, here they were suddenly putting, uh, getting a mortgage to three black families in a white neighborhood, and all of which areas, uh, got more difficult. Uh, was the, what was the scale of the transactions, uh, previously? This is, um, this is, uh, I, I assume from the record as, uh, as I read that although this was a package sale from Mr., am I saying his name right? Is it Aigner? How do you say his name? Hoxton. No, no, no, the seller. Aigner. Aigner. A, Aigner? Yes. The, Mr. Aigner was selling this, uh, these three sort of together. It was something of a package deal, but the, but these were three individual families going in for loans separately, right? That's right. Okay. Uh, in that, in that context, with the bank looking at each individual set of circumstances, and as Judge Rendell points out, uh, there being, uh, regulatory and, uh, underwriting guidelines that they're following, I guess I'm trying to find out, uh, whether the fact that they, uh, that these individuals borrowing previously from the bank may not have run into this problem makes it odd that when you do show up with significant water damage in it in this condition, what's odd about the bank saying, well, you got to fix that in order to get this loan? I mean, you may have gotten other loans in the past from the bank without a problem, but that's because you didn't show up asking to borrow a couple hundred thousand dollars on a home with sufficient enough water damage that you, you couldn't get an appraisal. What's odd about it is the, uh, uh, Hoxton, the, uh, loan officer, said from the very beginning, uh, well, you have some problems, and therefore, we're not going to process this loan. You, you can't do it. And, uh, uh, and it was only through the perseverance of my clients that they were even able to get these loans. But it's, and there's a comment in there, in our briefs, that Hoxton's comments, uh, were, were racial. This, you people, you people don't understand what's going on. You black people aren't smart enough. Well, he never said you black people, did he? I know, but the term, I'm sorry. Isn't that a very significant difference? No, as I understand it, the, the jargon, and I, I don't belong to the black culture, but I'm told, and the cases I've read, is that the, the, the slur comment is you people. That's what's said. They don't say you black people, they say you people. And in, in context, in the context of this case, here's, uh, three couples who are getting problem after problem after problem. These are educated people. We have a medical doctor, and we have a, a, a business person, and we have a person in, in, in military, and there's, and they ask you about these procedures, and they say you people don't understand. But there's a conflation of theories here, because you say, this bank has dealt with us year after year, and has treated us really well, and given us money. Right. So that goes against the fact that, well, the bank doesn't give money to you people. The theory here, I thought, was that the conditions were being imposed so they wouldn't move into the white neighborhood. That's right. So, I mean, which is it, and what evidence did you adduce, and what evidence did you ask for in discovery that was probative of these? Because most of the questions asked in discovery seemed to be geared towards approval ratings, and dealings other than focused on conditions imposed on others, and conditions imposed when you were going, moving into a black neighborhood versus white neighborhood. That's, that's a bunch of questions, but you could direct yourself to any one of them. Well, in hindsight, I guess we could have asked a few more questions. The questions that we did ask, we got absolutely nowhere with. It seems to me approval rates were a relevant issue. Well, this loan was, these loans were approved. They closed. I know, but we want to find out if they're giving blacks a hard time getting mortgages. I don't think you asked about that. I mean, is it like a general, you give blacks a hard time, or was the purpose of your claim to show you were discriminatory toward the Andersons, and the Wheatleys, and the Wilkinsons because they wanted to move into a white neighborhood. That's the claim, right? That's the claim, that's it. So, what I guess, the question being put to you is, I don't want to speak for Judge Rondeau, I'd like to know it, what did you ask that went to that claim? Well, we asked them their approval rates for blacks and whites in properties over $250,000. Okay, it seemed to me that it was a first step to find out, this data was available, we understood, and it was a first step, and from that, we would have inquired possibly even more about what exactly is going on, and we never got that far. We didn't get to the point where the Your Honor is asking, but I think in all these, all these discrimination cases, the courts always say that evidence of the policy of a company which might be discriminatory is always relevant. Let me ask you, let me ask this, what authority, if any, do you have for the proposition that you could forego a Rule 56 affidavit and still preserve an argument that you needed discovery before summary judgment was entered? My understanding, a Rule 56 affidavit is an affidavit which you produce when you tell the court, basically, that I need more time to obtain discovery. In this case... And you specify the discovery you want, right? Right, well, in this case, we specifically asked for the discovery, the court ruled. There was nothing else for us to do. I don't think the Rule 56 affidavit is part of this case at all. Well, we have precedent that says to the contrary, and I'm asking you if you've got precedent that is somewhere that rebutts our existing precedent that says if you want to preserve for appeal the assertion that you were denied discovery you needed, you need to follow the procedure set forth in Rule 56. I think the procedure that if you file a motion to compel, which we did in this case, and that was denied, there's nothing else we can say. I'm just asking if you've got any case that says that. If you don't, that's all right. I don't want to miss it if you've got it. I think it's in my briefs. Do you want us to consider this case as a direct evidence case, or do you want us to consider this case under the McDonnell-Douglas formula? Well, as I've said, I don't think... There is some direct evidence. This issue of you people... Well, you argued that the direct evidence may be in Mr. Hochstein's statement that, quote, you people don't understand the loan process, end of quotes. Hochstein wasn't a decision maker at the time. I think he certainly was. You think he was? Oh, he was the one creating the problem. The people in Connecticut who ultimately rolled upon this, they approved the loan. That's the only thing you point to as constituting direct evidence? I think the rest of it's all circumstantial. I think... So you're proceeding on the basis of this being a direct evidence case? No, I'm proceeding upon both. I think the courts take all the evidence, and when you take the direct evidence, you take it in context with everything else. And I think that... Well, some courts have said if there's a significant problem, a procedural problem, that can constitute intentional discrimination. And we have argued that. What Hochstein was doing was not what the bank was requiring. He went out on his own. He was a decision maker. He's the one who set up all these requirements. They weren't coming out of Connecticut. They were coming out of Hobson. That wasn't even his job. And everybody said that. So I think it's cumulative. Okay. We'll hear from you on rebuttal. Thank you. Thank you. Thank you. May it please the Court, Steve Fogdell for Appellees Wachovia Mortgage Corporation and Wachovia Corporation. You can speak up a little bit, please. Yes. Your Honors, let me start by addressing Judge Rendell's question to Mr. Grady, which is what do plaintiffs have to show to establish their prima facie case? And it's clear under Price Waterhouse they were required to identify similarly situated individuals who were treated differently. Now even if you assume in this case that that specific requirement doesn't apply, it's clear in any discrimination case the plaintiffs have to prove a set of facts sufficient to create an inference that they were treated differently because of their race. So there has to be, I mean, even under Pivarotto or other cases, there has to be something unusual about the conditions imposed. Exactly. And here... Well, here, why don't we have that with the requirement that before closing you have to with no assurance that you're going to be able to close. Isn't that pretty unusual? Your Honor, in this case it's not unusual. There's no dispute that the property had significant water damage and there's no dispute that the appraiser, Mr. Mullins, could not appraise the property because of that damage. There's no allegation that Mr. Mullins was racist or that he... Well, there was a little dispute about that. There's another appraiser who could appraise and couldn't you walk in and say, you know, I'm sorry, I can't appraise this. This needs at least $100,000 worth of damage, so I've got to appraise it at $138,000. If you really wanted to say no to the borrowers, you say, I'm sorry, we can't give you this loan because the appraiser says, as is, it's worth nothing. The assigned appraiser to the job, the appraiser who was assigned by Wachovia to do the appraisal, and there's no evidence that Mr. Hoxton had any influence on who that appraiser was, that appraiser concluded that he could not do an appraisal. Now, the fact that possibly another appraiser could have done an appraisal is not relevant because the bank isn't required to use an appraiser that the plaintiffs offer. Okay, then take the Anderson property out of it and look at the Wheatley property. There isn't an appraisal issue in that instance, but you have Mr. Hoxton again saying, or the bank saying, in effect, you put this property in moving condition, and the Wheatleys, as I understand the record, say, well, we can't go into somebody else's house and start painting and fixing up. That's not something we're allowed to do. How are borrowers supposed to address a condition like that? And we understand that it would be frustrating in this situation to want to buy a home. Clearly, it was frustrating. Clearly, where there are problems identified in the appraisal, but the evidence is clear, and it's indisputable that Mr. Hoxton didn't create the problem with the Wheatley property. The appraisal went to the underwriter in Connecticut. The underwriter, Ms. Fazzino, identified the problems in the appraisal, denied the loan. Now, at that point, and there's no evidence that Mr. Hoxton had any influence on the denial of the loan, but at that point, unfortunately, the Wheatleys had to make a choice. They either had to give up and not buy the property, or they had to try to address the issues to get the loan approved. Okay. Well, leave the livability issues out then for a moment, and talk about the change in position the bank had with upping it from a 10 percent to a 20 percent down payment. How close to closing did that happen to the Wheatleys? At what point did the light go on for Wachovian, they say? You know what? You can't close unless you come up with twice the money for a down payment. Your Honor, the plaintiffs allege in their complaint that they first heard about the increased down payment at the closing of the Wheatley, apologies, the closing of the Anderson and the Wilkins loans on the 6th. That's consistent with the underwriter Fazzino's conversation log, which is at page 317 in the record, which reflects that the borrowers were having discussions with Wachovia on the 5th and the 6th, and in the ensuing days to try to address the issue. So by August 6th, the Wheatleys knew about this increased requirement. And their closing was scheduled for when? All three properties were scheduled to close on the 6th. So at closing, they're told, come up with twice the cash? That's right. That's right. And while... Is there any inference to be drawn from that? There is not an inference to be drawn from that because the plaintiffs have not alleged that the underwriter Fazzino was racist or had any racial animus directed toward them. And the evidence is clear that that was a problem flagged by the underwriter because the Wheatleys were using business funds to purchase the home and they didn't have a CPA to verify those funds. And the underwriting requirements are clear that they had to have that CPA. There's no allegation that... There's no evidence that that requirement was in any way motivated by the Wheatley's raise. What did the bank do to alleviate the problem, if anything, that was created by that last minute demand for a doubling of the down payment? Well, Your Honor, in terms of alleviating the problem, there really was nothing that the bank could do at that point. It was a problem. It had to be addressed. The Wheatleys didn't have a CPA. The underwriting requirements are clear that they had to have one. And the bank ultimately didn't have to give the Wheatleys a loan under those circumstances, but they worked with the Wheatleys to make an exception. But as a condition of the exception... That's exactly what I'm asking. Right. When you say they did, in fact, work with them to make an exception, I'm asking, what did you do? The exception officer, Terry Ham, in Connecticut, determined that in her judgment, an exception could not be made unless the Wheatleys agreed to the 20% down payment because an exception loan cannot be sold to Fannie Mae. It has to be held in the bank's portfolio. And in the exception officer's judgment, to minimize the risk of that, the down payment had to be increased to 20%. That was the exception officer's judgment, and there's no evidence that she was in any way motivated or even knew the Wheatleys' raise. When had they put the 10% down? I mean, didn't somebody know before closing that there was a problem with the nature of the funds? I think the issue is that there were enough problems... that the underwriter didn't focus on the specific issue about the CPA until late in the process. Now, that is unfortunate, and there is no question that the Wheatleys were put in a frustrating situation as a result. But there is no evidence at all that the underwriter was motivated by the Wheatleys' raise. And in fact, the plaintiffs don't allege that she was. They make no allegation that anyone other than Mr. Hoxton was racially motivated, but he had no involvement in any of these increased conditions. Well, but he had communicated... I mean, clearly he was the one leading the show, and he was talking to people, and there was testimony that he was getting pressure because they didn't want people to move into this neighborhood. I mean, there was testimony. Looking at the case from the vantage point of the plaintiffs, we have evidence from the of more than just the you people. We have, they're getting pressure not to be able to move into the white neighborhood. We have the, there's one other statement, but I mean, there's still a number of things that, you know, bankers talk to the underwriter, talk to other people, and it was a very strange transaction with three having to close at the same time. Property's very unusual. You know, if you draw inferences, there was some conversation going on. Your Honor, there's no way a reasonable jury could infer from Mr. Hoxton's use of the word pressure. And he did say, and he conceded in his deposition that he said, I'm feeling pressure here. But there's no way a reasonable jury could infer from that that people in the community around Silver Lake were putting pressure on Mr. Hoxton to deny the loan, particularly when the decision-making was going on in Connecticut and there's no evidence that anyone in Silver Lake had any contact with underwriters in Connecticut to influence their decision-making process. And in addition, plaintiffs haven't even shown that the Silver Lake community is a, quote, white community. That hasn't been shown in any admissible way. And furthermore... Well, but Anderson said that Wicks commented, Silver Lake is an exclusively lily-white community and now here you guys come. There is testimony. There's hearsay. The Wicks statement is hearsay. Wicks can't speak for a party as an admission? Well she's not, she wasn't a party and her employer, Wachovia Bank, NAA, is not a party. And she wasn't speaking about a matter within the scope of her employment when she supposedly made that statement. But it's not for the truth of the matter. It's not offered for the truth of the matter. It is offered to show the truth of the allegation that there was discrimination, that this was a racially motivated series of incidents. But in addition, it's not simply, there's two pieces to the plaintiff's theory. One is, we weren't treated with difficulties when we bought in black neighborhoods. As soon as we bought in white neighborhoods, suddenly there were these problems. And so there's two pieces to the theory. And the first part of that, that they were treated more favorably when they bought in black neighborhoods, hasn't been shown either. There's no dispute that the prior loans they had through Wachovia were commercial loans. And plaintiffs have not shown what the condition of the properties were in those previous transactions. They haven't established that those are in any way comparable loans or covered by the similar guidelines. So that piece of the theory hasn't been shown, and that's an essential part of their theory, that there's differential treatment between buying in a black neighborhood versus buying in a white neighborhood. Can I ask a question on a slightly different topic, if that's all right? You filed a cross appeal. Why was the district court not within its discretion to say, choosing not to decide something that we don't have original jurisdiction over? Take this to the proper forum if you want to deal with it. There's no question the district court had discretion. However, here, when there has been three years of litigation, and where the district court's analysis of the federal claim is also dispositive of the state claim. Because the district court said, everything that happened here was in accordance with standard underwriting guidelines, standard business practices. And in that situation, there simply can't be a good faith and fair dealing claim if the bank complied with standard guidelines in making its decisions. And so in that situation, in this specific situation, it is an abuse of discretion not to simply enter judgment on the state law claim when it can be disposed of in exactly the same way as the federal claim. Although Hoxton may not have been a decision maker for purposes of federal law, nonetheless, his conduct could be more relevant in his plain old state good faith respondeat superior claim, could it not? Even under a state law analysis, there's no dispute that Hoxton was not, it's indisputable that Hoxton was not a decision maker on every piece of this series of transactions. Even as to the condition of the Anderson property, and Hoxton conceded at his deposition that he said to Mr. Anderson, you're going to need to make repairs if you're going to get an appraisal, because you have to have an appraisal to get the loan. But for federal law, you need a decision maker. But if you're not complaining about the decision, you're complaining about conditions imposed, then isn't his status as an employee or agent sufficient for a good faith claim? The argument would have to be that it was somehow unfair that the Wheatleys had to, that the Andersons had to repair significant water damage to the property. And there's no dispute that it was damaged, and they haven't shown that they were entitled to the loan with the property in that state. So there's nothing unreasonable, they'd have to show that it was in some way unreasonable that they had to repair the property. And there's just no evidence to support that allegation. We understand that they didn't want to do it, and that they would have preferred to wait until after closing, but there's no evidence that it's in some way unreasonable to expect the property to be repaired beforehand. If there are no other questions, I'll yield the rest of my time to the court. Thank you. Thank you. Let me, I guess we're talking about inferences of discrimination. And I think that one of the most significant inferences of discrimination was the fact that when Hoxton, that when Wheatley went to settlement on August the 6th, on the day of the settlement, they were said, oh, by the way, you need an approval by a certified roofer that your roof is okay. And of course, they didn't have it. It was the first they had heard about it. The appraisal, which had been made at least three weeks before that, mentioned maybe some problems with the roof. But on the very day of the settlement, my client's contention is that it was one more instance when Hoxton says, okay, no certificate, no settlement, too bad, and I'm off to vacation now. I think it's a very significant thing that if in fact the appraisal people thought it was a problem, then surely they would have notified him before that. Mr. Grady, one thing that's key, it seems in your case, is the fact that Silver Lake is a lily white community. Right. I've looked at the pictures and the description that this is a commercial property or near commercial on DuPont Highway. I mean, I grew up in Wilmington, Delaware, for good or bad. And while I can't take extra record notice of anything, and the demographic that's in here, there's not very much proof that this is in fact the white bastion that you make it out to be. What evidence is there that we're dealing with the invasion of a lily white community by three black families? We do have an affidavit by Mr. Hill who says that it's basically a white community. What does that mean? It's basically a white community. Well, that it's all white, that there's a Silver Lake, okay? And my client testified to it. And if I may, the homes around Silver Lake are all white, okay? Are inhabited by 100% white people? I think it's pretty close. Because the demographic that shows it. But if you look at a map or something, they will include, for example, they will include that area up by Delaware State College, which of course is not part of this area. Part of this, it's true, a couple of these houses which are involved, they back up on one side to the lake and on the other side to the highway. If you drove down a highway, it looks like the highway. If you're sitting in a boat in the lake, you say all the neighbors are white. Is it commercial zone? The zoning? On the highway houses? I know at the present, I'm not positive. All right. I'm not positive what they were at the time. I know you could probably make them commercial. I think they've been made commercial since all this has happened. The other thing before I sit down, if I can, address Judge Jordan's comments about the 56F and the appeal of a discovery order. And in my brief, I've cited Moore's and the cases cited in Moore's. And the cases in Moore's say that the way you appeal a discovery order is first of all, if you file a motion to compel and it's denied, you have to wait until the end of the case. And that's how you appeal it. And there's nothing in there to suggest that you have to go through any Rule 56 efforts. So I... But there's a difference, is there not, between denial of a motion to compel and appealing and saying that was wrongly decided and saying there was summary judgment granted without my opportunity for sufficient discovery. And therefore, because of the lack of discovery, that should be overturned. Isn't the Rule 56F affidavit necessary for that second argument on appeal? I guess I never thought so. I thought once you made it, I mentioned it in my briefs that I didn't have an opportunity. But if I filed a Rule 56 motion, what would happen? The judge would say, hey, Mr. Grady, I've already ruled on this. Denied. You're wasting my time. I don't think there's ever any duty to waste the court's time. I think that's what would have happened. And I mean, that's my response to that. I guess my time's up. In conclusion, we've listed in our brief about five or six different errors, five or six different instances of inferences of discrimination. I think you have to take them all together. And the basic intention is that Hoxton particularly made life difficult for these people.  And only through their perseverance were they able to get a mortgage. And it cost them more money. With no dispute that there were repairs needed. The allegation is we had to spend more money because Hoxton wanted them at a higher standard. Thank you, Your Honor. Thank you very much. Case is well argued. Take it under advisement. Call our next case.